IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 15-00324-01-CR-W-DGK |
| ARTHUR WATERS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress a firearm seized from his residence as well as defendant's subsequent statement on the grounds that (1) officers were not legally entitled to conduct a protective sweep of defendant's residence because they had no reasonable basis to believe that anyone but defendant, who was in custody, was in the home; (2) during the protective sweep officers searched areas that could not have been occupied by a person; and (3) defendant's custodial statement is a fruit of the illegally seized evidence. I find that law enforcement officers conducted a permissible protective search, the search behind the couch was not beyond the scope of the protective search, and the evidence observed during the protective search was in plain view. Therefore, defendant's motion to suppress should be denied.

*I.*  *BACKGROUND*

On September 3, 2015, police went to defendant's residence to execute an arrest warrant. Upon entering the residence, officers conducted a protective sweep during which a deputy marshal moved the couch away from the wall to make sure no one was hiding behind or underneath it. He observed a loaded firearm lying on the

floor under the couch.  A search warrant was obtained based in part on the observations of the police during the protective sweep.

A complaint was filed on September 4, 2015, charging defendant with possessing a firearm and eight rounds of ammunition after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  An indictment was returned on October 1, 2015, charging the same offense except with the penalty enhancement found in 18 U.S.C. § 924(e).  Defendant filed the instant motion to suppress on December 30, 2015 (document number 21).  On January 8, 2016, the government filed a response, arguing that officers had reason to believe another individual was present in the residence besides defendant, they had reason to believe a person could be hiding behind the couch, and the firearm would inevitably have been discovered because the search warrant was valid even absent the information about officers observing the firearm (document number 23).

On January 22, 2016, I held an evidentiary hearing on defendant's motion to suppress.  The government appeared by Assistant United States Attorney Bruce Clark.  The defendant was present, represented by Federal Public Defender Laine Cardarella.  The following witnesses testified:

    1.    Detective John Keil, Kansas City, Missouri, Police Department

    2.    Detective Michael Miller, Kansas City, Missouri, Police Department

    3.    Deputy Jason Roberts, United States Marshal Service

    4.    Dannaica James, defendant's fiancée

    5.    Alan Bush, Investigator for the Federal Public Defender

2

Case 4:15-cr-00324-DGK   Document 32   Filed 02/08/16   Page 2 of 16

In addition, the following exhibits[1] were admitted:

| | | |
|---|---|---|
| P. Ex. 1 | | Picture of front door |
| P. Ex. 2 | | Picture of kitchen with view of back door |
| P. Ex. 3 | | Picture of utility room |
| P. Ex. 4 | | Picture of living room from kitchen |
| P. Ex. 5 | | Picture of kitchen from living room |
| P. Ex. 6 | | Picture of living room |
| P. Ex. 7 | | Picture of drugs |
| P. Ex. 8 | | Close-up picture of drugs |
| P. Ex. 9 | | Picture of pistol and magazine |
| P. Ex. 10 | | Picture of stairs |
| P. Ex. 11 | | Application for search warrant |
| P. Ex. 12 | | Search warrant for 2202 Monroe |
| P. Ex. 13 | | Kansas City, Missouri, Police Department Incident Report dated September 3, 2015, by Detective Keil |
| P. Ex. 14 | | Kansas City, Missouri, Police Department Incident Report dated September 8, 2015, by Detective Mike Miller |
| D. Ex. 1 | | Close up picture of couch against the wall |
| D. Ex. 2 | | Close up picture of couch against the wall |

---

[1] All of the photographs entered into evidence were taken after the search warrant was executed on defendant's residence. The government exhibits were taken immediately after the search (Tr. at 14-15, 29, 52-53). Defendant's exhibits 11 and 12 were also taken immediately after the search, but Defendant's exhibits 1, 2 and 3 were taken on November 13, 2015 -- a little over two months after the arrest -- and the location of the couch and love seat had been switched in the living room (Tr. at 80, 82, 86-87, 88, 90-91, 100).

    D. Ex. 3    Picture of a dollar bill next to the bottom of defendant's couch

    D. Ex. 5    Police report documenting everything seized during execution of the search warrant

    D. Ex. 11    Photograph of couch after part of it had been pulled away from the wall

    D. Ex. 12    Photograph of gun on the floor with the couch pulled away from the wall

A transcript of the hearing was filed on January 25, 2016 (document number 30).

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. The Kansas City, Missouri, Police Department's Career Criminal Unit was contacted by another unit in the police department about locating defendant to execute outstanding arrest warrants (Tr. at 5, 15). On September 3, 2015,[2] they received information about defendant's fiancée, Dannaica James, i.e., what kind of car she drives, and they set up surveillance on her vehicle near a school in the 2500 block of Agnes (Tr. at 5, 6-7, 15, 17, 74; P. Ex. 13). When she came out of the school and got into her car, police followed her to a residence at 2202 Monroe, which is half of a duplex (Tr. at 7, 16, 17). Ms. James lives at this residence with defendant (Tr. at 74).

---

[2]During questioning, the prosecutor referred to the arrest as having occurred on September 13: "Q. So, on September 13th of last year, 2015, were you involved in the arrest of Mr. Waters? A. Yes." (Tr. at 5). However, the police report is dated September 3 (P. Ex. 13) and the criminal complaint was filed on September 4, 2015, so I conclude that the prosecutor merely misspoke and the witness did not notice the date discrepancy. There is no dispute that the arrest took place on September 3, 2015.

2. There were about eight to ten officers in the surveillance crew around the residence (Tr. at 7). Ms. James went into the residence at approximately 9:45 a.m. (Tr. at 7; P. Ex. 11).

3. At approximately 12:50 p.m., detectives conducted a car stop on an individual who was an associate of defendant (Tr. at 12; P. Ex. 11). During an interview, the individual told police that defendant lives at 2202 Monroe with his fiancée and two children and that the individual uses defendant as a source of illegal drugs (Tr. at 24; P. Ex. 11). The individual made a controlled telephone call to defendant who indicated he would be at the house for a while and had what the individual was requesting (Tr. at 13-14; P. Ex. 11).

4. At 2:50 p.m., Ms. James was observed exiting the residence at 2202 Monroe, but she turned around on the stairs and went back to the door (Tr. at 7, 16; P. Ex 11). She knocked on the door and about ten seconds later the door was opened from inside and she entered the residence (P. Ex. 11). About 30 seconds later, she exited the residence again and got inside the vehicle (Tr. at 16, 74; P. Ex. 11). Surveillance officers detained her as soon as she got into the car (Tr. at 7, 74-75; P. Ex. 11). They asked if defendant was inside the residence, and Ms. James said he was (Tr. at 7, 19, 35, 46, 74-75; P. Ex. 11). She said no one else was inside the residence (Tr. at 19, 46, 74-75).

5. As officers were heading to the back door, she asked if they were going to kick the door in and they said they would (Tr. at 75). Officers headed to the residence while one officer stayed by the car with Ms. James (Tr. at 7-8, 76). She said, "Hold on, let me call him." (Tr. at 75). Ms. James called defendant and said the police were

outside waiting for him and would he please come to the door (Tr. at 75). He said, "Well, hold on." (Tr. at 75). Ms. James thinks defendant was in the upstairs bathroom (Tr. at 75-76). Ms. James was standing next to an officer by her car and said, "Hold on, don't kick in my door, he's coming to the door." (Tr. at 76). The officers who had approached the house did not hear Ms. James make this statement (Tr. at 19-20, 46). At the time, Ms. James was standing about 20 to 30 yards away in the alleyway near her car (Tr. at 53).

      6.     A number of officers were at the rear door of the residence which faced west, and others were toward the front of the residence (Tr. at 7-8). Officer Phillips observed the blinds move on the second floor of the residence on the south side of the house (Tr. at 36), and then about 30 seconds later Sergeant Merrill and Detective Miller observed the blinds move on the first floor of the residence from the kitchen in the back of the house (Tr. at 9, 36, 46; P. Ex. 11). It appeared that someone used a hand to pull a slat of the blinds down and look out (Tr. at 47). Detective Keil was made aware of these observations (Tr. at 9). Detective Miller knocked on the door and shouted, "Police Department, Mr. Waters you need to come outside." (Tr. at 9, 36, 56; P. Ex. 11). Police announced their presence and told defendant to come to the door several times (Tr. at 10). After getting no response from inside, Sergeant Greenwell authorized entry (Tr. at 10).

      7.     The back door of the residence was forced open a couple minutes after police had first announced their presence (Tr. at 10, 36; P. Ex. 11). The back door opened into a utility room, and the kitchen was directly to the right (Tr. at 30, 37, 57; P. Ex. 2, 3). Through the kitchen was the living room (Tr. at 30). A couch was on the right

6

side of the room against the wall, there were end tables with lamps on either side of the couch, and a love seat was at a right angle to the couch and directly across from the kitchen (Tr. at 30-31, 44, 45, 60, 65). There was about a foot or two between each table and the end of the couch (Tr. at 87). The couch was very close to the wall, leaving room for electrical plugs in outlets behind the couch[3] (Tr. at 79, 85; D. Ex. 12). The bottom of the couch has a "lip" that is about half the width of a dollar bill off the floor (Tr. at 80-81, 91; D. Ex. 3). The front door to the residence is on the left side of the room when one is coming from the kitchen (Tr. at 30-31, 44, 45). The stairwell leading to the upstairs is directly in front of the front door (Tr. at 31). The stairwell cannot be seen from the kitchen (Tr. at 61).

8.   Officers entered the kitchen, and defendant said he was "coming down" presumably from upstairs (Tr. at 37, 57-58). Defendant was first seen when he was in the living room, and he was directed into the kitchen where he was taken into custody (Tr. at 37, 47, 58, 62, 72). Defendant was handcuffed, searched for weapons, and eventually removed from the residence (Tr. at 48, 62, 70).

9.   Detective Miller has been involved in thousands of arrests, many of which were in-home arrests (Tr. at 27). During a protective sweep, the officers go into a residence and look anyplace where a person could hide (Tr. at 27). In the past, Detective Miller has found people hiding in refrigerators, in stairwells, under beds, in between mattresses of beds, in closets, inside couches, and inside laundry machines

---

[3]There was testimony by Ms. James about whether there was a plug behind the couch or not on the day of the arrest, but the pictures showing the firearm behind the couch clearly show a plug in an outlet (Tr. at 83-84, 87; D. Ex. 12).

(Tr. at 27-28). Specifically Detective Miller testified about a fold-out couch where someone was "folded up" inside where the mattress should be (Tr. at 28).

10. Deputy Marshal Roberts has been involved in hundreds of in-home arrests and has had training on where to search during a protective sweep (Tr. at 55-56). He was taught to look anywhere a body can hide such as in closets, behind doors, behind couches, behind water heaters, and inside furniture (Tr. at 56).

11. Officers conducted a protective sweep of the first floor of the residence to check for other individuals who may pose a threat to their safety (Tr. at 38, 58, 67, 70). When officers entered the living room from the kitchen, they could see some marijuana, a pipe with some residue, and a grinder in plain view on the floor between the couch and love seat (Tr. at 34; P. Ex. 7, 8). Deputy Roberts bumped the couch with his hip to check and see how heavy it was, and the couch moved (Tr. at 59, 60, 66). The floor beneath the couch was tile[4] (Tr. at 93; P. Ex. 9, D. Ex. 3, D. Ex. 11, D. Ex. 12). He pushed one side of the couch away from the wall to see if anyone was hiding behind it (Tr. at 59, 60, 66). The couch was easily large enough for an individual to hide behind or inside (Tr. at 59-60). He saw part of a firearm lying on the floor which had been underneath the couch (Tr. at 66, 68). He alerted one of the detectives (Tr. at 68).

---

[4]Although Ms. James testified that a rug was tucked up underneath the front part of the couch (Tr. at 94-97), the photographs show that the rug was slightly under the front of the love seat but the couch only reached the edge of the rug after it had been pulled away from the wall (P. Ex. 7 [which shows the left side of the couch with its back almost to the wall and although the rug appears to be folded up slightly, the couch does not reach the rug]; D. Ex. 11 [which shows the left side of the couch still essentially against the wall and not touching the rug in the front]). In any event, the rug appeared to be very thin (D. Ex. 3) and there is no dispute that the back legs of the couch were on tile (Tr. at 97).

Deputy Roberts did not push the couch very far away from the wall -- the gun was lying just over one tile square[5] away from the wall, and the couch was only moved far enough to see part of the gun (Tr. at 69; P. Ex. 9).

12.     When Detective Keil, the search warrant affiant, walked through the back door into the kitchen, the other officers pointed out the clear bag of marijuana[6] lying on the living room floor, and the handgun located behind the sofa in the living room (Tr. at 11). The marijuana was in plain view and was seen before anything was moved by the officers (Tr. at 25). The gun was found loaded and underneath the couch (Tr. at 42; D. Ex. 12).

13.     The search warrant was obtained at 11:50 p.m. and was executed at about 1:00 in the morning (Tr. at 41). The time between entry (3:00 p.m.) and the issuance of the warrant was spent electronically providing the information to Detective Keil (the affiant), the prosecutor's office, and the judge (Tr. at 41). Police recovered a digital scale from a kitchen cabinet (Tr. at 51). Two additional bags of marijuana were found in an upstairs bedroom (Tr. at 51).

### *III.    WHETHER PROTECTIVE SWEEP WAS PERMISSIBLE*

Defendant first argues that law enforcement officers were not legally permitted to conduct a protective sweep of the living room because they had defendant in custody and had no reasonable basis to believe that anyone else was in the home since Ms. James had left the residence and officers had seen no one else enter or exit the

---

[5]The tile squares appear to be about 1 1/2 times the length of the handgun (P. Ex. 9).

[6]The substance in the plastic bag field tested positive for marijuana (Tr. at 11).

9

residence during the five hours they had the house under surveillance before executing the arrest warrant. A "protective sweep" is a quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or others. Maryland v. Buie, 494 U.S. 325, 327 (1990).

There is no question that police had the authority to enter defendant's residence, since officers had a valid arrest warrant and reasonably believed defendant resided there and was present when the warrant was executed. Maryland v. Buie, 494 U.S. at 330; Payton v. New York, 445 U.S. 573, 603 (1980). Incident to arrest, officers can, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Maryland v. Buie, 494 U.S. at 336.

When police arrest a suspect in his home pursuant to an arrest warrant, they may conduct a warrantless protective sweep if they have a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the area harbors an individual posing a danger to the officers or others. Maryland v. Buie, 494 U.S. at 328 (citing Michigan v. Long, 463 U.S. 1032, 1049-1050 (1983), and Terry v. Ohio, 392 U.S. 1, 21 (1968)). A protective sweep is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. Maryland v. Buie, 494 U.S. at 327. A protective sweep is justified by the threat of accomplices launching a surprise attack during an arrest and is particularly important during an in-home arrest, due to the heightened potential for an ambush in unfamiliar surroundings. Id. at 333. A protective sweep may be executed after an arrest if there is a reasonable possibility that other

10

persons may be present on the premises who pose a danger to the officers. United States v. Davis, 471 F.3d 938, 944 (8th Cir. 2006) (citing United States v. Jones, 193 F.3d 948, 950 (8th Cir. 1999)).

Here I find that the officers reasonably believed someone besides defendant may be present who may pose a threat to their safety. An associate of defendant's had telephoned him shortly before the arrest warrant was executed and had made arrangements to purchase drugs from defendant in his home. It is reasonable for an officer to believe that an individual may be armed and dangerous when that individual is suspected of being involved in a drug transaction because weapons and violence are frequently associated with drug transactions. United States v. Cash, 378 F.3d 745, 749 (8th Cir. 2004). The possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious and justifies a Terry search of anyone coming or going from such a place. Id. "[W]e see no reason why this analysis should not be extended from the Terry context to the Buie context." Id. "[A]n officer arresting a suspected drug trafficker in one room of a multi-room residence is justified in conducting a Buie sweep out of concern that there could be individuals lurking in the other rooms who may resort to violence to thwart the arrest." Id.

In addition to the evidence of an impending drug transaction, police had reason to believe others were present who may pose a threat to their safety because of their observations shortly before they entered the residence. Police observed someone appear to look out an upstairs window and a few seconds later observed someone appear to look out a downstairs window. They knocked, announced their presence, and told defendant he needed to come outside. They got no response and forced their

way into the residence; but when they entered, defendant indicated he was upstairs and was coming down, suggesting he was not the person they had seen looking out the downstairs window. Defendant argues that because his fiancée told police that no one besides defendant was inside, police had no reasonable belief that anyone else could be present and posing a threat to their safety. Defendant cites no cases holding that such a statement by a suspect's fiancée removes any reasonable belief that others may be present, and I have found none. Furthermore, it defies logic to strip police of their ability to ensure their own safety because a relative of a suspect says no one else is home despite suggestions to the contrary.

Because police reasonably believed that more than one individual could be present inside the residence and could be hiding, possibly planning to resort to violence to thwart the arrest, Id., they were permitted to conduct a protective sweep upon entering the residence.

### IV. WHETHER SEARCH EXCEEDED THE SCOPE OF A PROTECTIVE SWEEP

Defendant next argues that even if police had the authority to conduct a protective sweep, they exceeded the permissible scope of the sweep by searching underneath the sofa where no person could reasonably be hiding.

The credible evidence before me establishes that:

(1) Police reasonably believed someone besides defendant may be in the residence.

(2) Someone who claimed to get illegal drugs from defendant made a controlled phone call to defendant and made arrangements to purchase illegal drugs from him at his residence that day.

12

(3) Defendant was first seen by the police coming through the living room in which the sofa was located.

(4) Defendant indicated he was coming downstairs when police entered the residence, but they had seen someone look out a downstairs window shortly before forcing open the back door.

(5) The floor on which the sofa was sitting was tile.

(6) Deputy Roberts bumped the couch with his hip to determine whether it would move and it did.

(7) Deputy Roberts only pulled one side of the couch a very short distance away from the wall to determine whether someone was hiding behind it.

(8) The officers reasonably believed, due to their experience and training, that someone could be hiding behind the sofa.

Based on this credible evidence, I find that this limited search did not exceed the scope of a protective sweep.

Despite the evidence regarding the amount of space between the floor and the bottom lip of the couch, or the presence or absence of plugs and outlets behind the couch, or whether the front legs of the couch were on or off a very thin rug on top of the tile, or the distance between the couch and end tables or the couch and the wall, I find it unreasonable to expect police to make such detailed observations and calculations before moving one side of a couch a very small distance while conducting a protective sweep for their own safety. A protective sweep is justified by the threat of accomplices launching a surprise attack during an arrest and is particularly important during an in-home arrest due to the heightened potential for an ambush in unfamiliar

13

surroundings. Maryland v. Buie, 494 U.S. at 333. Deputy Roberts bumped the couch with his hip and determined that it would move. Because someone could have ducked under or behind the couch and slid it back into place on the tile floor, that one bump with his hip told Deputy Roberts that he better check to make sure no one was there to jeopardize the safety of the officers. This split-second determination is much more reasonable than expecting officers to consider the distance between the bottom of the couch and the floor or the amount of space between the couch and tables or the wall.

Defendant's oral argument during the hearing that the police thought they had hit the mother lode because the drug paraphernalia and small bag of marijuana had been seen in plain view right next to the couch is unpersuasive (Tr. at 118). Once police saw the marijuana and paraphernalia, they had probable cause to obtain a search warrant and there would be no reason to risk suppression by searching for drugs or other evidence in places where a person could not hide.

Although there is no binding authority one way or another with regard to this determination of reasonableness, I note that other courts have similarly found that a protective sweep can include searching behind or underneath couches. In United States v. Paopao, 469 F.3d 760, 767 (9th Cir. 2006), an officer had conducted a quick protective sweep but on his way out noticed a gap between the sofa and the wall. Concerned that someone may be hiding behind the sofa, he searched there and found a handgun and ammunition magazine. The court held that Officer Lum's search behind the sofa did not exceed the scope of the protective sweep. "Particularly instructive in this determination is Officer Lum's testimony that he was not secure in the notion that

14

no one was left in the apartment until after he searched behind the sofa. The District Court found this portion of Officer Lum's testimony credible."

In United States v. Tucker, 1999 WL 44073 (10th Cir. 1999), officers arrived at Tucker's residence to serve an arrest warrant. When they entered, they took him into custody and performed a protective sweep during which an officer moved a sofa out from the wall but found no one hiding there. Instead he observed a pile of cocaine. On the kitchen counters police saw scales, a razor blade, an ammunition clip and white powder residue. The court found that moving a piece of bulky furniture such as a couch did not exceed the scope of a protective sweep.

In United States v. Ayon, 2000 WL 34032985 (N.D. Iowa, March 3, 2000), police found an electronic scale underneath a couch, and the scale was not suppressed since it was found during a protective sweep.

Finally, in United States v. Brown, 484 F. Supp. 2d 985 (D. Minn. 2007), police found a shotgun underneath a couch during protective sweep.

Because the credible evidence establishes that the police reasonably believed that someone could be hiding under or behind the couch who could pose a threat to their safety, they did not exceed the scope of a protective sweep by moving the couch far enough away from the wall to determine that no one was there.

If evidence observed during a protective sweep is in plain view and is immediately recognizable as firearms and drug paraphernalia, officers may seize those items. United States v. Pruneda, 518 F.3d 597, 603-604 (8th Cir. 2008). In this case, the evidence establishing probable cause to believe that marijuana and weapons would

15

Case 4:15-cr-00324-DGK   Document 32   Filed 02/08/16   Page 15 of 16

be found inside defendant's residence was observed in plain view by police while they were lawfully present when the items were observed.

## *VI.    CONCLUSION*

Based on all of the above, I find that (1) officers legally performed a protective sweep of defendant's living room, (2) officers did not exceed the scope of a permissible protective sweep by moving one side of the couch away from the wall to determine whether someone was hiding behind or underneath the couch, (3) the items listed in the affidavit in support of the search warrant were observed in plain view by officers legally present, and (4) defendant's statement is not the fruit of any poisonous tree.  Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 8, 2016